## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Botanic Oil Innovations, Inc.,

        Plaintiff,

vs.

Rain Nutrition, LLC, Viable Options, and
Dr. Arnold S. Leonard, M.D., Ph.D.,

        Defendants.

Case No.:  **10-cv-00645-DWF-FLN**

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff Botanic Oil Innovations, Inc. ("BOI"), for its Complaint against the above-named Defendants, Rain Nutrition, LLC ("Rain"), Viable Options, and Dr. Arnold S. Leonard, M.D., Ph.D., states and alleges as follows:

### INTRODUCTION

1.      In this lawsuit, BOI seeks substantial damages and other relief from Rain for its ongoing, intentional, and unlawful conduct relating to its scheme to steal BOI's trade secrets, intellectual property, and other valuable assets.

2.      BOI was founded by Mark Mueller in 1999 with a mission to create natural products such as antioxidant supplements to help people live longer, healthier lives.

3.      Mr. Mueller took the existing cold press process for extracting oils and flours from botanicals, and improved it, creating the NatureFRESH Cold Press™ process that produces super-potent antioxidant oils and powders.

4.      Dr. Arnold S. Leonard, M.D., Ph.D., is a world renowned physician and former Head of Pediatric Surgery at the University of Minnesota.

5.      After Dr. Leonard heard about the benefits of BOI's natural antioxidant oils he and his colleague, Dr. Daniel Saltzman, Chair of Pediatric Surgery at the University of Minnesota, conducted laboratory studies on the effects of BOI's natural antioxidant supplements and found that they had the ability to enhance the body's immune system.

6.      It was only through the joint efforts of Mr. Mueller, Dr. Leonard, and Dr. Saltzman that the potential health benefits of BOI's natural antioxidant supplements were recognized.

7.      Rain is a Utah limited liability company that manufactures and distributes health supplements.

8.      In the Spring of 2009, BOI and Rain entered into contract negotiations through which BOI sought to become Rain's sole supplier of cold pressed seed powders for use in Rain's antioxidant supplements.  Meanwhile, Rain was attempting to purchase not only BOI's cold pressed seed powders, but also its valuable proprietary intellectual property including its:

   (a)    NatureFRESH Cold Press™ technology—for which considerable research was conducted by BOI independently of Drs. Leonard and Saltzman on characteristics and attributes of the NatureFRESH Cold Press™ oils and seed powders;

   (b)    seed powder formulas; and,

   (c)    the research conducted by Drs. Leonard and Saltzman.

9.      On May 5, 2009, after Rain was unable to obtain BOI's intellectual property, Rain entered into a Relationship Agreement with Dr. Leonard—who by that time had been a Medical Advisor to BOI as well as a member of BOI's Board of Directors since 2004.

10.     On information and belief, Rain received BOI's proprietary and trade secret seed powder formulas and dosing recommendations from Dr. Leonard—including specific seed

percentage breakdown recommendations and directions—and used the stolen intellectual

property in developing, manufacturing, and processing its own products.

11.     In fact, apparently frustrated by its substandard and ineffectual business model,

Rain has not only misappropriated BOI's trade secrets, but it has recently copied BOI's

advertisements and marketing material, claimed it possesses patents that, upon information and

belief, it has never even applied for, and is doing its best to conceal the same after BOI notified

Rain of its multiple violations of law.

## PARTIES

12.     BOI is a Wisconsin corporation with its principal place of business at 1540 South

River Street, Spooner, WI 54801.

13.     BOI has engaged in continuous and systematic business in Minnesota.

14.     Rain is a Utah limited liability company with its principal place of business at

5255 West 11000 North, Suite 100, Highland, UT 84003.

15.     On information and belief, Defendant Viable Options, is a Missouri business with

its principal place of business at 1806 Swift #105, N. Kansas City, Missouri 64116.  On

information and belief, Viable Options was a Rain distributor until on or about March 5, 2010,

and has engaged in wrongful conduct as described herein.

16.     Dr. Arnold S. Leonard, M.D., Ph.D. ("Dr. Leonard") is a citizen and resident of

the State of Minnesota. He resides at 5212 Colonial Drive, Minneapolis, Minnesota 55416, and

works at 715 Florida Avenue South, Suite 305, Golden Valley, Minnesota 55426.

17.     Toby Norton ("Mr. Norton") is the President of Rain and was intimately involved

in Rain's negotiations with BOI and Dr. Leonard.  He is a citizen of the State of Utah.  On

information and belief, Toby Norton personally took part in and directed the wrongful conduct

described herein. Mr. Norton is not a party to this action but BOI intends to add Mr. Norton, and others, as parties as discovery progresses.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over BOI's Minnesota state law claims, because those claims are related to claims within the Court's original jurisdiction and form part of the same case or controversy.  In addition, this Court has original jurisdiction under 28 U.S.C. § 1332(a) in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

19.     On information and belief, Defendants transact business in this judicial district by selling or offering to sell products, either directly or indirectly through distributors, that infringe BOI's copyrights or by conducting other business within this judicial district.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## JURY TRIAL DEMAND

21.     BOI demands a jury trial on all counts so triable.

## FACTS

I.      **THE RELATIONSHIP BETWEEN BOI AND DR. LEONARD**

22.     BOI placed its trust and confidence in Dr. Leonard to perform as a loyal member of its Board of Directors and as a loyal Medical Advisor.

23.     Dr. Leonard was a member of BOI's Board of Directors and Medical Director until March 4, 2010.

24.     Dr. Leonard was a member of BOI's management team from 2003 through March 4, 2010.

25.     Dr. Leonard, along with Dr. Saltzman—another of BOI's Medical Advisors— researched and identified the ability of botanic oils to enhance the body's immune system.

26.     The NatureFRESH Cold Press™ technology and the research regarding seed powder formulas is the key element in BOI's valuable proprietary and trade secret intellectual property.  This intellectual property is also a significant competitive advantage to BOI in the health supplement market.

27.     BOI invested substantial resources and over $1 million to research and develop its products.  And it was only after decades of Dr. Leonard's research, along with BOI's contributions, that the product formulas were completed.

28.     This intellectual property is not generally known within the industry and BOI has taken steps to guard its secrecy.  For example, employees, Medical Advisors, and members of BOI's Board of Directors are required to sign non-disclosure and non-compete agreements.

29.     Furthermore, BOI's website informs viewers that if they would like to read the research underlying its statements about the health benefits of its antioxidant supplements, that they may do so only after signing a non-disclosure agreement.

## II.     RAIN'S NEGOTIATIONS WITH BOI

30.     From February 2009 through April 2009, Rain attempted to purchase BOI's highly valuable proprietary and trade secret intellectual property including the NatureFRESH Cold Press™ manufacturing technology, ground-breaking antioxidant supplement formulas, and underlying research.

31.     In an April 5, 2009 letter, Mr. Norton wrote to Mr. Mueller outlining the remaining "areas of concern" in the negotiations.

32.     The very first area of concern described by Mr. Norton was listed as "competitive" and included Rain's "ability to market the NatureFRESH Cold Press™ technology as part of [its] product's value proposition."

33.     Mr. Norton went on to propose several possible business structures including a joint venture, a buy/sell arrangement for BOI's intellectual property and assets, or a licensing agreement—the end result of each of Mr. Norton's proposals was the purchase and use of BOI's intellectual property.

34.     After BOI repeatedly refused to sell or license its intellectual property to Rain, Rain agreed to purchase cold pressed seed powders used in its products from BOI.

35.     BOI never agreed to sell or license its intellectual property to Rain.

36.     In connection with Rain's promise to use BOI as its supplier, Rain placed production-sized orders with BOI for Organic Black Cumin seed flour.

37.     At the same time, Rain also placed orders for research and development samples of Ruby Red Grape, Chardonnay Grape, Salba, Pomegranate, Milk Thistle, and Blueberry seed powders.

38.     After Rain placed these orders with BOI, however, Rain surreptitiously began using sources other than BOI for Rain's cold pressed seed powders.

39.     Rain has also failed to follow through on its agreement to pay for a Black Cumin shipment specifically ordered from overseas to meet Rain's needs.

40.     Between June 2009 and September 2009, BOI and Rain negotiated Rain's purchase of cold pressed seed flours from BOI.

41.     On June 15, 2009, Bart Brockbank, Rain's Chief Operating Officer, sent a list of Rain's projected supply needs for Black Raspberry, Black Cumin, Blueberry, and Grape seed powders for July 2009 through April 2010.

42.     Based on Rain's projections, on September 24, 2009, Luke Palen informed Rain that BOI would need to order a large quantity of Black Cumin, Blueberry, and Grape seed flours, costing a total of $117,187.50, in order to meet Rain's needs and that Rain would need to send BOI a check for 40% of the total as a down payment.

43.     On September 30, 2009, Rain confirmed that it would be sending BOI a check for the Black Cumin seed flour down payment but that Rain did not want to order the Blueberry and Grape seed flours at that time.

44.     In reliance on Rain's promise to send the down payment, BOI ordered 9,750.00 lbs of Black Cumin seed flour.

45.     On October 14, 2009, after BOI still had not received the 40% down payment for the Black Cumin seed flour, Luke Palen, BOI's marketing manager, sent an email to Bart Brockbank telling him that BOI had put in the order but still had not received Rain's check.

46.     Mr. Brockbank responded that day, stating that Rain would not be sending a check for the down payment.  Instead, Rain had unilaterally decided to buy the Black Cumin seed flour BOI had in stock instead.

47.     On October 15, 2009, Luke Palen reminded Rain that BOI had already placed the order for Black Cumin in order to meet Rain's needs based on Mr. Brockbank's confirmation that he was having Rain's CFO send a check to BOI.

48.     BOI repeatedly contacted Rain about Rain's refusal to honor its promise to pay for the Black Cumin seed flour order.

### III.    RAIN'S AGREEMENT WITH DR. LEONARD

49.    After BOI refused to sell its intellectual property to Rain, Mr. Norton turned to Dr. Leonard for the information.

50.    Mr. Norton knew that Dr. Leonard was a member of BOI's Board of Directors.

51.    Mr. Norton also knew that Dr. Leonard was a member of BOI's Medical Advisory Board.

52.    In fact, in response to Dr. Leonard's question, "I'm on their board and also their medical directory.  You knew that didn't you?"  Mr. Norton responded:  "Of course."

53.    Despite Mr. Norton's knowledge, on May 5, 2009, he entered into a written "Relationship Agreement" with Dr. Leonard on behalf of Rain.

54.    The Agreement acknowledges that Dr. Leonard "has studied and performed extensive research regarding nutrition and . . . the effects of various natural antioxidants on human health and disease prevention" and "has formulated various nutritional supplements based on his research and nutrition expertise."

55.    Under the Agreement Dr. Leonard agreed to, among other things:

    (a)    "Endorse Rain products and assist in the education of the public regarding the science and benefits of the products."

    (b)    "Consult with and assist Rain on potential new product development and existing product improvement" where Rain would "own the intellectual property rights associated with product development and formulation." Indeed, Dr. Leonard was to be "primarily responsible for the development of new products for Rain."

    (c)    "Participate in and be a published member of the Rain Medical and Scientific Council."

56.    In return, Rain was to grant Dr. Leonard a ten percent relative member interest in Rain Nutrition, LLC, promote Dr. Leonard, reimburse his "incidental expenses," and pay for Dr. Leonard's travel and lodging for Rain-sponsored seminars or events in which he participated.

57.    Rain's Agreement with Dr. Leonard also included a detailed "Trade Secrets" section in which Rain stated that all information regarding manufacture or distribution of Rain's products "constitutes specialized and highly confidential information not generally known in the industry," trade secrets of Rain, and that "it is essential to [Rain] to protect the confidentiality of this trade information."

58.    The Agreement asked Dr. Leonard to agree to "act as a trustee of [Rain's] confidential information and . . . hold such information in trust and confidence for [Rain's] sole and exclusive use and benefit."

59.    The Agreement further stated that a breach of the trade secret section could result in "severe damage" to Rain.

60.    In addition to the trade secret section, the Agreement included a non-compete section that would not allow Dr. Leonard to "directly or indirectly, enter into, or in any manner take part in, any business, profession, or other endeavor which competes" with Rain.

61.    The Relationship Agreement also included "special confidentiality agreements" providing that:  "any announcement, whether public or within the Company, shall be closely coordinated by the parties.  As such, no announcement, press release, or any other similar communication shall be made in any manner without all parties agreeing on the manner, timing, place, method and/or medium used for such announcement."

62.    The purpose of the special confidentiality agreements was to maximize growth and "to prevent any adverse effects to the parties."

63.    On October 22, 2009, Rain entered into an "Amended Relationship Agreement" with Dr. Leonard.

64.     The Amended Relationship Agreement is nearly identical to the original Relationship Agreement, also requiring that Dr. Leonard endorse Rain products, maintain primary responsibility for Rain's development of new products, and participate in the Rain Medical and Scientific Council.

65.     The main difference between the Relationship Agreement and the Amended Relationship Agreement is in Rain's compensation of Dr. Leonard.

66.     Section 2.b. of the Amended Relationship Agreement decreases Dr. Leonard's original ten percent relative member interest in Rain Nutrition, LLC to eight percent while increasing Rain's reimbursement of Dr. Leonard for his services rendered under the Agreement from $750 per month to $6,000 per month.

67.     Although the Amended Relationship Agreement was not signed by Rain, it remains a valid contract since, on information and belief, Rain has continued to abide by its terms—including making regular monthly payments to Dr. Leonard totaling $18,000.

68.     Dr. Leonard knew that he owed ongoing fiduciary duties and duties of loyalty to BOI when he entered into the Relationship Agreement and the Amended Relationship Agreement with Rain but did not receive consent from BOI to enter into either the Relationship Agreement or the Amended Relationship Agreement with Rain.

69.     In fact, Dr. Leonard did not disclose either the Relationship Agreement or the Amended Relationship Agreement to BOI until after Dr. Leonard had already signed the Agreements.

70.     Dr. Leonard knew that he owed ongoing fiduciary duties and duties of loyalty to BOI when he, on information and belief, gave BOI's proprietary and trade secret intellectual property including the NatureFRESH Cold Press™ manufacturing technology, antioxidant

supplement formulas, and underlying research to Rain. But, Dr. Leonard did not receive consent from BOI to disclose or provide BOI's proprietary and trade secret intellectual property to Rain.

71.     Nor did BOI discover that Dr. Leonard had given BOI's intellectual property to Rain until December of 2009.

72.     On information and belief, Rain and Mr. Norton knew that as a member of BOI's Board of Directors and Medical Advisory Board that Dr. Leonard had a duty to maintain the secrecy of BOI's intellectual property, including the product formulas and research.

73.     On information and belief, Rain and Mr. Norton knew that Dr. Leonard had acquired BOI's intellectual property under circumstances giving rise to a duty to maintain its secrecy.

## IV.    RAIN'S CONTINUED DECEPTION AND USE OF BOI'S PROPRIETARY INTELLECTUAL PROPERTY

74.     On information and belief, despite Rain's knowledge that Dr. Leonard had acquired BOI's intellectual property under circumstances giving rise to a duty to maintain its secrecy, Rain received BOI's proprietary and trade secret seed powder formulas and dosing recommendations from Dr. Leonard, including specific seed percentage breakdown recommendations and directions.

75.     On information and belief, Rain stole BOI's proprietary and trade secret "Boost" ingredient combination formula and is using the formula in production of the Rain product "Soul."

76.     On information and belief, Rain stole BOI's proprietary and trade secret "Smart" ingredient combination formula and is using the formula in production of the Rain product "Rush."

77.     On information and belief, Rain stole BOI's proprietary and trade secret "Recovery" ingredient combination formula and is using the formula in production of the Rain product "Storm."

78.     On information and belief, Rain stole BOI's proprietary and trade secret "Probiotic+" ingredient combination formula and is using the formula in production of the Rain product "Pure."

79.     Rain's failure to obtain the right "to market the NatureFRESH Cold Press™ technology as part of [its] product's value proposition" did not stop it from stealing not only BOI's proprietary cold press technology, but also marketing the process as its own "patented" cold press process using nearly identical wording as that used by BOI on its copyrighted website. A true and correct copy of Rain's Nutrition Overview presentation, available on its Facebook page is attached at Exhibit 1; a true and correct copy of Rain's website, which provides the link to Rain's Facebook page, is attached at Exhibit 2.

80.     On information and belief, Rain advertises, promotes, and sells its products in a number of different ways, including on the interactive website located at www.rainnutrition.com, which Rain owns and operates.  Rain uses the confusingly similar marketing language as that found on BOI's website throughout its own website.

81.     On information and belief, Rain advertises, promotes, and sells its products through a distribution network, encouraging distributors to post similarly confusing marketing language on their own websites.  A true and correct copy of Viable Options' website as of February 17, 2010—a company that acted as a Rain Distributor until on or about March 5, 2010 and used the identical, and false, information presented by Rain on its website—is attached at Exhibit 3.

82.     Immediately after announcing its contractual relationship with Dr. Leonard—an announcement prohibited under the "special confidentiality agreements" section of the contract with Dr. Leonard—Rain began posting information on its website phrased to mislead the public and take credit for the research and methods developed by BOI and Dr. Leonard such as the following currently posted on Rain's FAQ page:

(a)     "Q.  Why does it say 'proprietary blend' on the supplement facts?
        A.  That is the 'secret sauce'.  Dr. Leonard has spent years perfecting the proper mixture of ingredients in the product.  That mixture of ingredients is what makes the product effective.  The product mixture makes us who we are so it is 'proprietary'."

(b)     "Q.  Why do you feel Rain supplements are more potent than competitor's supplements?
        A.  Rain uses the highest quality of ingredients possible.  Rain uses seeds that hold an amazing level of pure antioxidants.  Rain also uses a cold press process.  This process is done without heat or chemicals, which destroy the efficacy of antioxidants."

(c)     "Q.  Is there a limit to the body's capacity to absorb antioxidants?
        A.  Yes. 3000 milligrams of antioxidants is Dr. Leonard's suggested daily usage."

83.     Rain's mischaracterizations continue on its Products page:

(a)     "Formulated using the powerful extracts found in the seeds of fruits and herbs, Rain Nutrition's productions have stronger, more concentrated levels of antioxidants.  Through a proprietary cold press process, the essential nutrients inside the seed is extracted and the efficacy of those nutrients are preserved.  The natural power that comes from this perfect combination is ground-breaking."

(b)     "Rain Nutrition employs a COLD PRESS PROCESS that removes the nutrient rich oils and flours from botanical seeds without harming their efficacy in the process. . . . Countless manufacturers use systems that require high temperatures and harsh chemicals to obtain extracts that are less effective.  Rain Nutrition has taken great measures to ensure that the process used is certified organic and chemical-free.  The products that Rain has created and will create over time will use only the extracts from this cold press process."

84.     On November 23, 2009 Dr. Leonard wrote to Mr. Norton pointing out that numerous individuals were using Dr. Leonard's name on websites where they promote Rain products.  Dr. Leonard requested that Rain contact the individuals and have references to Dr. Leonard removed.  Websites such as the following use Dr. Leonard's name in promotion of Rain products without authorization of BOI or Dr. Leonard:

(a)     http://www.bringontherain.net

(b)     http://www.bobhowardmarketing.com/rain-nutrition-energy-drink

(c)     http://www.facebook.com/group.php?gid=127053508717

(d)     http://hubpages.com/hub/aboutrainnutrition

(e)     http://www.mom2momkc.com/?a=profile&u=15612&t=blog&blog_id=2712

85.     In the same November 23, 2009 letter Dr. Leonard specifically stated that it had been his understanding that BOI would receive credit for their cold press process but that there is no mention of BOI in Rain's production information and that Rain's "website states that RAIN uses a cold pressed extraction process, which makes it sound like RAIN is doing the cold pressing.  As you know, BOI's cold press process is the reason behind the potency of these products, and thus, they should receive the credit for creating these super antioxidants."

86.     Rain's website continues to claim credit for BOI's cold press process.

87.     In the November 23, 2009 letter Dr. Leonard also detailed Rain's misstatements regarding the research it claims to have supporting the effectiveness of its products:  "Moreover, all of our research is strictly on BOI products, not on any other products that you are using.  You also have some products using our research, yet not buying ingredients from BOI."

88.     Rain's website continues its blatant mischaracterization of the research owned by BOI and conducted by Dr. Leonard on BOI's products—implying that Dr. Leonard's decades-long research was conducted on Rain's products and is owned by Rain.

89.     Despite repeated attempts to have Rain remove these misrepresentations from its website, Rain has not only kept these representations on its website, but has also posted videos and other marketing materials on its website taken, in large part, word-for-word from BOI's copyrighted website.

90.     BOI is the owner of all right, title and interest, including all copyrights for The Immuno-Viva Promotional Video, which was created by Luke Palen, BOI's marketing manager, and Pixel Farm Interactive for use on BOI's website on February 1, 2008.

91.     Since at least April 1, 2008, BOI has used The Immuno-Viva Promotional Video to advertise, promote, and sell its products.

92.     On January 24, 2010 BOI applied for copyright registration for The Immuno-Viva Promotional Video by:

(a)     Submitting an application for the work;

(b)     Submitting a copy of the work; and

(c)     Paying the appropriate fee for the submission.

93.     A true and correct copy of BOI's copyright application for The Immuno-Viva Promotional Video is attached as Exhibit 4.

94.     BOI's website contains a copyright notice.  A true and correct copy of the webpage on which BOI's copyright-protected video appears is attached as Exhibit 5.

95.     Viable Options advertised, promoted, and sold Rain products on the website www.viableoptions.com.  Viable Options' website used the same marketing language used by Rain to mislead consumers as to the origin and supposed benefits of Rain's products.

96.     Rain, Mr. Norton, and Viable Options have copied, distributed, and publicly displayed BOI's copyrighted work in connection with the advertising and promotion of Rain's products.

97.     Rain and Mr. Norton continue to copy, distribute, and publicly display BOI's copyrighted work in connection with the advertising and promotion of Rain's products.

98.     On information and belief, Rain, Mr. Norton, and Viable Options have engaged in their infringing conduct to lead consumers to falsely believe that Dr. Leonard's research was conducted on Rain's products and that Rain's products offer the same health benefits of BOI's products.

99.     Since at least September 2009, Rain has maintained its website, and has encouraged consumers and distributors to visit other Rain websites for more information about its products, the stolen BOI research, and the cold press process.  A representative screen shot of Rain's January 2010 video is shown below:



100.    In the process of taking credit for BOI's cold press process, and the underlying science developed by Dr. Leonard and owned by BOI, Rain has also marked at least one of its websites with the following language:

> Rain Nutrition uses a **patented** COLD PRESS PROCESS. This process gently presses and separates the seeds into oils and flours without the use of heat or chemicals. This process in done in such a way that the extracted oils and flours are preserved in their natural state ensuring that Rain's products maintain exceptional potency and richness.
>
> ***
>
> Formulated using the powerful extracts found in the seeds of fruits and herbs, Rain Nutrition's products have stronger, more concentrated levels of antioxidants. Through a **patented** cold-press process, the essential nutrients inside the seed is extracted and the efficacy of those nutrients are preserved. The natural power that comes from this perfect combination is ground-breaking. As the nutritional supplement market grows and changes, Rain Nutrition will follow and continue to raise the bar with world class science leading the charge.

101.    Despite Dr. Leonard's November 23, 2009 letter, Rain and Mr. Norton have continued to mark the cold press process as "patented" on their website. The following is a representative screen shot from the www.DoctorRain.com website showing Rain's blatant misrepresentations:



102.    Viable Options also marked its website with the language:

Rain Nutrition harnesses the rich nutritional power of the seed through a **patented** cold press technology in a unique and powerful line of products.

COLD PRESS TECHNOLOGY

Rain Nutrition uses a **patented** cold press technology.

103.    On information and belief, the Rain, Mr. Norton, and Viable Options marked these pages for advertising and commercial purposes, intending to not only claim a patent on BOI's proprietary cold press process but also to showcase the stolen research owned by BOI and conducted by BOI Medical Advisors on BOI's products while misleading consumers into believing that such research was conducted for Rain on Rain's products.

104.    On information and belief, Rain does not hold a patent, assignment or license thereof, for the use of cold press technology.

105.    On information and belief, Rain, Mr. Norton, and Viable Options know and have known that the cold press technology is unpatented.

106.    On information and belief, Rain, Mr. Norton, and Viable Options have no good faith basis to include the word "patented" on their websites.

107.    On information and belief, Rain, Mr. Norton, and Viable Options made these misrepresentations on their websites, intending that these misrepresentations will allow them to gain more customers at BOI's expense.

108.    On information and belief, Rain and Mr. Norton continue to make these misrepresentations on their website, intending that these misrepresentations will allow them to gain more customers at BOI's expense.

109.    On information and belief, at the time Rain, Mr. Norton, and Viable Options posted these misrepresentations on their websites, they knew them to be false.

110.    On information and belief, consumers have purchased products as a result of Rain, Mr. Norton, and Viable Options' mischaracterization of the cold press process.

## COUNT I
### (Aiding and Abetting Breach of Fiduciary Duty Against Rain)

111.    BOI incorporates by reference all preceding paragraphs as if fully set forth herein.

112.    Dr. Leonard owed a fiduciary duty to BOI.

113.    Rain knew that Dr. Leonard owed BOI a fiduciary duty in all of his duties and actions as a Board Member and Medical Advisor of BOI.

114.    Even though they knew that Dr. Leonard owed BOI a fiduciary duty, they still aided Dr. Leonard to actively breach the fiduciary standard of loyalty.

115.    Rain substantially assisted, advised, encouraged, aided, and abetted Dr. Leonard's breaches of fiduciary duty, as described herein.

116.    As a direct and proximate consequence of Rain aiding and abetting Dr. Leonard's breaches of fiduciary duty, BOI has been damaged in an amount to be determined at trial, but believed to be in excess of $10 million.

## COUNT II
### (Tortious Interference with Contract Against Rain)

117.    BOI incorporates by reference all preceding paragraphs as if fully set forth herein.

118.    BOI and Dr. Leonard were engaged in a contractual relationship because Dr. Leonard is a member of BOI's Board of Directors, the Co-Chair of BOI's Medical/Science Committee, and a Co-Leader of BOI's Medical/Science Business Unit and because BOI finances Dr. Leonard's Golden Valley, Minnesota office.

119.    Rain had actual knowledge of the contractual relationship between BOI and Dr. Leonard.

120.     Rain had actual knowledge of the highly valuable proprietary intellectual property held by Dr. Leonard in the trust and confidence of BOI.

121.     Through Rain's Relationship Agreement and Amended Relationship Agreement with Dr. Leonard, Rain intentionally procured the breach of Dr. Leonard's contract with BOI.

122.     As a result of Rain's tortious interference, BOI has been damaged in an amount to be determined at trial, but believed to be in excess of $10 million.

## COUNT III
### (Receiving Stolen Property Under Minn. Stat. § 609.53 Against Rain)

123.     BOI incorporates by reference all preceding paragraphs as if fully set forth herein.

124.     BOI has been damaged and injured by, on account of, and as a direct, proximate, and foreseeable result of Rain's violations of this statute in an amount to be determined at trial.

125.     As a direct and proximate result of Rain's receipt and possession of BOI's stolen property, BOI is entitled to recover "three times the amount of actual damages sustained . . . the costs of suit and reasonable attorney's fees," as provided by Minn. Stat. § 609.53, subd. 4.

126.     By reason of such violations and pursuant to Minn. Stat. § 609.53, subd. 4, BOI demands treble damages, attorneys' fees and costs, and other remedies as requested herein.

## COUNT IV
### (Misappropriation of Trade Secrets Under Minn. Stat. § 325C.01 *et seq.* Against Rain)

127.     BOI incorporates by reference all preceding paragraphs as if fully set forth herein.

128.     BOI has adopted reasonable measures to maintain the secrecy of its intellectual property including but not limited to:  BOI's NatureFRESH Cold Press™ manufacturing technology, seed powder antioxidant supplement formulas, and underlying research.

129.     BOI has instituted internal company policies and procedures regulating the access to, designation of, and dissemination of its proprietary and confidential information.

130.    The NatureFRESH Cold Press™ manufacturing technology, seed powder antioxidant supplement formulas, and underlying research are valuable proprietary property and trade secrets.

131.    BOI has the right to exclusive ownership, enjoyment, and use of its trade secrets.

132.    Rain knew or should have known that when it received BOI's proprietary intellectual property from Dr. Leonard that Dr. Leonard acquired the confidential intellectual property under circumstances giving rise to a duty to maintain its secrecy and limit its use.

133.    Rain knew or should have known that when it received BOI's proprietary intellectual property from Dr. Leonard that he owed a duty to BOI to maintain the secrecy of the information and limit its use.

134.    Rain knew or should have known that when it used BOI's seed powder antioxidant supplement formulas and underlying research in developing and producing Rain's products that such use was through the unauthorized application of BOI's proprietary information, which was illegally stolen.

135.    Rain's misappropriation of BOI's trade secrets was carried out in a willful and malicious manner in disregard of BOI's rights.

136.    As a direct and proximate result of Rain's misappropriation of BOI's trade secrets, BOI has sustained damages in an amount to be proven at trial.

137.    As a direct and proximate result of Rain's willful and malicious misappropriation, and pursuant to Minn. Stat. §§ 325C.03 and 325C.04, BOI is entitled to an award of exemplary damages, attorneys' fees, and other relief as requested herein.

## COUNT V
### (Copyright Infringement Against Rain)

138.    BOI incorporates by reference all preceding paragraphs as if fully set forth herein.

139.    BOI holds and owns a valid copyright in The Immuno-Viva Promotional Video.

140.    Rain's actions constitute copyright infringement in violation of 17 U.S.C. § 501 *et seq.*

141.    As a result of Rain's wrongful conduct, BOI is entitled to the preliminary and permanent injunctive remedies specified in the prayer for relief, damages in an amount to be proven at trial, and other relief as requested herein.

### COUNT VI
### (False Marking under 35 U.S.C. § 292 Against Rain and Viable Options)

142.    BOI incorporates by reference all preceding paragraphs as if fully set forth herein.

143.    In violation of the patent laws of the United States, Rain and Viable Options have falsely marked upon, affixed to, or used in advertising in connection with unpatented articles, the word "patented."  *See* 35 U.S.C. § 292.

144.    An example of Rain's false marking is shown at ¶ 102.  This website states "Rain Nutrition uses a **patented** COLD PRESS PROCESS" and "[t]hrough a **patented** cold-press process the essential nutrients inside the seed is extracted and the efficacy of those nutrients are preserved."

145.    An example of Viable Options' false marking is shown at Exhibit 3.  The website stated that "Rain Nutrition harnesses the rich nutritional power of the seed through a **patented** cold press technology" and "Rain Nutrition uses a **patented** cold press technology."

146.    On information and belief, Rain and Viable Options do not hold a patent, assignment or license thereof, for the use of cold press technology.

147.    On information and belief, Rain and Viable Options know and have known that the cold press technology is unpatented.

148.     On information and belief, Rain and Viable Options have no good faith basis to include the world "patented" on the websites.

149.     The erroneous marking of Rain's website—which Rain uses to advertise, promote, and sell its products claimed to have been manufactured through the use of a cold press process—with the word "patented" coupled with the absence of a reasonable good faith belief that any patent, assignment, or license thereof applies to Rain's use of the cold press technology warrants the drawing of an inference that Rain had a fraudulent intent in marking the website with the word "patented" or advertising its products as being manufactured through the use of a patented process.

150.     The erroneous marking of Viable Options' website—used to advertise, promote, and sell Rain products claimed to have been manufactured through the use of a cold press process—with the word "patented" coupled with the absence of a reasonable good faith belief that any patent, assignment, or license thereof applies to Rain's use of the cold press technology warrants the drawing of an inference that Viable Options had a fraudulent intent in marking the website with the word "patented" or advertising Rain's products as being manufactured through the use of a patented process.

151.     On information and belief, Rain continues these false markings or advertisements on its website with the intent and purpose to deceive the public for its own commercial gain.

152.     Rain and Viable Options have manufactured, offered for sale, and sold products or articles that they have falsely advertised as being manufactured through the use of "patented" cold press technology.

153.     Pursuant to 35 U.S.C. § 292, Rain and Viable Options are liable for a $500 fine for each such article falsely marked or advertised or each offense of false marking.

## COUNT VII
### (Minnesota Deceptive Trade Practices Under Minn. Stat. § 325D.44
### Against Rain)

154.　　BOI incorporates by reference all preceding paragraphs as if fully set forth herein.

155.　　Rain and Viable Options' actions constitute willful and knowing deceptive trade practices, in violation of the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44.

156.　　BOI and the consuming public have been, are, and will be, irreparably injured if Rain's deceptive trade practices are allowed to continue.

157.　　As a result of Rain's wrongful conduct, BOI is entitled to preliminary and permanent injunctive relief, damages in an amount to be determined at trial, and recovery of attorneys' fees and costs incurred.

## COUNT VIII
### (Declaratory Judgment Against Dr. Leonard and Rain)

158.　　BOI incorporates by reference paragraphs 12 through 22 as if fully set forth herein.

159.　　BOI is a "person" within the meaning of Minn. Stat. § 555.13.

160.　　Pursuant to Minn. Stat. § 555.02, BOI is interested under the contract between Dr. Leonard and Rain and BOI's rights are affected by the contract such that BOI may have the validity of the contract determined.

161.　　Pursuant to the Minnesota Declaratory Judgment Act, Minn. Stat. §§ 555.01 *et seq.* an actual controversy exists between BOI and Defendants regarding the status and validity of the Relationship Agreement between Dr. Leonard and Rain.

162.　　Dr. Leonard undertook to act as an agent and fiduciary for BOI and owed BOI fiduciary duties and duties of loyalty.

163.    BOI placed trust and confidence in Dr. Leonard to keep its highly valuable proprietary and trade secret intellectual property, including the NatureFRESH Cold Press™ manufacturing technology, ground-breaking antioxidant supplement formulas, and underlying research, confidential by virtue of his membership in BOI's Board of Directors and Board of Medical Advisors, and, among other things, Dr. Leonard's knowledge of and control over BOI's intellectual property, including the NatureFRESH Cold Press™ manufacturing technology, antioxidant supplement formulas, and underlying research.

164.    Because Dr. Leonard owed BOI a fiduciary duty, at all times material herein, he was required to conduct himself with the utmost good faith toward BOI, in all of his duties and actions as director and advisor of BOI, and to perform such duties and actions in accordance with the fiduciary standards of care, loyalty, skill, and judgment.

165.    Dr. Leonard knew, or had reason to know, that BOI placed its trust and confidence in him and was relying on him to perform his duties, including keeping BOI's proprietary and trade secret intellectual property including the NatureFRESH Cold Press™ manufacturing technology, antioxidant supplement formulas, and underlying research confidential, in BOI's best interests.

166.    Dr. Leonard failed to fully disclose material facts, failed to conduct and protect the research and development of BOI's products in a manner consistent with his fiduciary duties, and by failing to provide BOI with undivided loyalty. More specifically, Dr. Leonard breached his fiduciary duties by, without limitation, entering into a Relationship Agreement and Amended Relationship Agreement with Rain, failing to seek or receive consent to enter into either Agreement, and providing proprietary and trade secret intellectual property to Rain.

167.   BOI respectfully requests that this Court enter a judgment declaring that the contract between Dr. Leonard and Rain is void.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court:

1.   Award damages to BOI in an amount exceeding $10 million to be determined at trial;

2.   Award BOI its costs of suit;

3.   Award BOI its above-described compensatory damages, treble damages, attorneys' fees and costs, and other remedies as determined by the Court pursuant to, among other things, Minn. Stat. § 609.53, subd. 4;

4.   Award BOI its above-described actual damages, exemplary damages, attorneys' fees, and other remedies as determined by the Court pursuant to, among other things, Minn. Stat. § 325C.01 *et seq*.;

5.   Award BOI its above-described damages, and other remedies as determined by the Court, or alternatively awarding statutory damages for each work infringed by Rain;

6.   Award BOI its above-described damages of $500 for each instance of false marking, and other remedies as determined by the Court pursuant to, among other things, 35 U.S.C. § 292.

7.   Enjoin Rain from using BOI's intellectual property obtained from Dr. Leonard including but not limited to BOI's NatureFRESH Cold Press™ manufacturing technology, seed powder antioxidant supplement formulas, and underlying research, and from falsely claiming that Rain products have health benefits based on Dr. Leonard's research;

8.      Declare the Relationship Agreement between Dr. Leonard and Rain to be void; and,

9.      Award BOI such other and further relief the Court deems just and proper.


Date:  October 8, 2010                    ROBINS, KAPLAN, MILLER & CIRESI L.L.P.


By:    *s/Jennifer M. Robbins*
        Christopher W. Madel (#230297)
        cwmadel@rkmc.com
        Jennifer M. Robbins (#0387745)
        jmrobbins@rkmc.com

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
612-349-8500
Fax:  612-339-4181

ATTORNEYS FOR PLAINTIFF BOTANIC OIL
INNOVATIONS, INC.